241 S.W.2d 83 (1951)
PRUGH, COMBEST & LAND, Inc.
v.
LINWOOD STATE BANK (South Side Bank, third party defendant).
No. 21458.
Kansas City Court of Appeals. Missouri.
June 4, 1951.
Spurgeon L. Smithson, William E. Carmell and Ernest Hubbell, all of Kansas City, for appellant.
*84 Leo T. Schwartz, Kansas City (John A. McGuire and Don M. Jackson, Kansas City, of counsel), for respondent Linwood State Bank.
Cornelius Roach, Mack Hency, Kansas City (Roach, Brenner & Wimmell, Kansas City, of counsel), for respondent South Side Bank.
BOUR, Commissioner.
The plaintiff-appellant, Prugh, Combest & Land, Inc., sued Linwood State Bank for $4950, the aggregate amount of certain checks which were drawn by plaintiff against its account in that bank, and which were paid by the drawee bank on forged endorsements of the payees' names and charged to plaintiff's account. There were two such checks, each being described in a separate count of the petition.
Before filing its answer, Linwood State Bank filed a motion for leave to implead the South Side Bank as a third party defendant. This motion was sustained, and the original defendant, as a third party plaintiff, thereupon filed a third party petition in two counts against South Side Bank. The latter filed a motion to dismiss each count of that petition for failure to state a cause of action. This motion was sustained as to count one and overruled as to count two, and no further mention of count one is necessary. Count two alleged that South Side Bank "accepted for payment" the checks described in the original petition, stamped each check with its guaranty of prior endorsements, and then presented the checks to the drawee, Linwood State Bank, which paid them and charged the amounts thereof to the account of the original plaintiff, and that in so doing the drawee bank relied on the guaranty of prior endorsements. The prayer of count two was for judgment against South Side Bank for all sums adjudged payable by Linwood State Bank to the original plaintiff. The original plaintiff did not amend its petition to state a claim against the third party defendant. It is not necessary to state the contents of the answers filed by the original defendant and the third party defendant, as the issues raised by the pleadings will be discussed in the course of the opinion.
The case was tried before the court without a jury. At the close of all the evidence the original plaintiff requested the court to dictate to the court reporter or to prepare and file a brief opinion containing a statement of the grounds for its decision and the method of determining any damages awarded; and the third party defendant requested the court to make certain findings of fact and to state certain conclusions of law. Thereafter the court filed its opinion which adopted the findings of fact and conclusions of law requested by the third party defendant. The court found against the original plaintiff on both counts of its petition, and it was ordered and adjudged "that the plaintiff have and recover nothing by its petition and the same is hereby dismissed, that the petition of Linwood State Bank as third party plaintiff be and is hereby dismissed, and that the defendants herein go henceforth discharged * * *." The original plaintiff appealed.
Under Section 114 of the Civil Code, Mo.R.S.A. § 847.114, R.S.Mo. 1949, § 510.310, it was the duty of the trial court on request of either party to dictate or prepare and file "a brief opinion containing a statement of the grounds for its decision * * *." We have the right to consider the opinion of the trial court in ruling the cause here, and it is our duty to "review the case upon both the law and the evidence as in suits of an equitable nature." Dye v. School Dist. No. 32 of Pulaski County, 355 Mo. 231, 239, 195 S.W.2d 874, 879.
Plaintiff is a corporation engaged in the investment security business in Kansas City, Missouri. Linwood Bank and South Side Bank are corporations engaged in the general banking business in the same city. For convenience, the original plaintiff will be designated as "plaintiff"; and the original defendant as "defendant," "drawee" or "Linwood Bank."
The material facts are not seriously disputed. At all times in question plaintiff *85 had a checking account with defendant. It appears that plaintiff had a "working arrangement" with defendant whereby plaintiff's customers could borrow money from that bank and pledge their stocks as collateral security. In accordance with this arrangement, plaintiff would have its customer sign a promissory note payable to defendant, list the collateral security thereon, and send the note and the customer's collateral to defendant. After the bank approved the loan and credited plaintiff's checking account with the amount thereof, plaintiff would issue its check to the customer for the amount of the loan and the bank would charge the amount of the check to plaintiff's account when the check was presented for payment.
R. L. Ryan was at all times in question employed by plaintiff as a security salesman or "customers' man." In the course of his employment Ryan met Lt. Colonel Raymond J. Harvey and Lt. Colonel Ross Young, who were then stationed at Ft. Leavenworth, Kansas. These army officers became customers of plaintiff and, through Ryan, bought and sold securities. Prior to the discovery of Ryan's wrongful conduct all dealings between plaintiff and the officers were handled by Ryan and he was the only person connected with plaintiff who had any personal contact with the officers. Ryan conceived a scheme to obtain money by fraudulent means, which scheme was successfully carried out on two occasions. As indicated above, two checks were involved, each being described in a separate count of plaintiff's petition.
In May, 1947, Ryan falsely represented to J. Dewey Land, plaintiff's secretarytreasurer, that Colonel Harvey wished to borrow $3200 and to pledge his stocks as collateral security for the loan; and that if a loan could be arranged he would have Harvey sign a note for $3200. Land furnished Ryan with an undated note for $3200, payable to Linwood Bank. When Ryan returned the note to Land on May 6, 1947, it purported to have been signed by Harvey as the maker thereof, but the signature was a forgery. Thereafter Land, or some other officer of plaintiff, dated the note May 7, 1947, and inserted the due date, August 5, 1947. Harvey owned 636 shares of stock. The stock certificates had been issued in Harvey's name, and he had left them with plaintiff for safekeeping. In accordance with Land's instructions, Mrs. M. H. Thompson, plaintiff's cashier and assistant secretary-treasurer, forwarded the forged note and Harvey's stock certificates to Linwood Bank, the collateral security being listed on the note. The bank accepted the note and collateral and credited plaintiff's account with the sum of $3200. Land also instructed Mrs. Thompson to fill out a check for $3200 payable to the order of Harvey. This check was dated May 6, 1947, signed by Land as secretary-treasurer, and by Mrs. Thompson as cashier, and was drawn on Linwood Bank. After the check was completed, Ryan stated that he would send it to Harvey along with a personal letter which he intended to write him. The check was given to Ryan to be mailed to the named payee, but he did not send it to Harvey. Instead, he endorsed on the check the name of the payee, then his own; and on May 7, 1947, he presented the check for deposit at the South Side Bank and the amount thereof was credited to his personal account in that bank. The bank endorsed the check, "Prior Endorsements Guaranteed. South Side Bank," and sent it through the clearing house to the drawee, which paid the check and charged it to the account of plaintiff.
This brings us to the second phase of the fraudulent scheme. In August, 1947, Ryan falsely represented to Land that Colonel Ross Young was being transferred to a foreign country and wanted to borrow $3500 on his securities. After some discussion as to the amount of the loan, Land finally told Ryan that a loan of $1750 could be arranged. A few days thereafter, Ryan delivered to Land a note bearing the purported signature of Young and payable to Linwood Bank, but with the date, the due date, and the amount left blank. The signature was a forgery. Land, or Mrs. Thompson, inserted the amount, $1750, the date, September 11, 1947, and the due date, December 10, 1947. At that time Young owned 1475 shares of stock. All of the *86 stock certificates had been issued in the name of Young, except one certificate for 106 shares which had been issued in the "street name" of J. Dewey Land, and they were held by plaintiff for safekeeping. Following the usual procedure, Mrs. Thompson sent the forged note and Young's stock certificates to Linwood Bank, which accepted the same and credited plaintiff's account with the sum of $1750. Mrs. Thompson drew a check for $1750 on Linwood Bank, payable to the order of Young and dated September 9, 1947. This check was signed by E. L. Combest, as vicepresident of plaintiff, and by Mrs. Thompson as cashier. Land delivered the check to Ryan who pretended that he would enclose it in a personal letter he was writing to Young. In this instance, Ryan forged the endorsement of the payee, and under the payee's name he endorsed the check with a rubber stamp as follows: "Signature Guaranteed, Prugh, Combest & Land, Inc., of Kansas City, by J. D. L. Cashier-Treas." Land's initials "J. D. L." were evidently inserted by Ryan. The stamped endorsement was not an authorized endorsement of plaintiff. Plaintiff had such a stamp in its office, but it was used for the purpose of guaranteeing signatures on stock certificates, and Ryan had no authority to use it for any purpose. After signing his own name under the above-mentioned endorsements, Ryan deposited the check in South Side Bank to his own credit. That bank, following usual practice, stamped the check with its guaranty of prior endorsements and sent it through banking channels to Linwood Bank, which paid the check and charged plaintiff's account with $1750.
It was admitted by the pleadings that both checks were paid by Linwood Bank out of plaintiff's account therein, which was at all times sufficient to meet the checks. In due course of business, the cancelled checks were returned to plaintiff. On or about October 17, 1947, Young received a statement which showed that his account with plaintiff had been credited with the amount of the supposed loan, $1750, then debited with the amount of the check ($1750) drawn by plaintiff on Linwood Bank, payable to the order of Young and dated September 9, 1947. This statement also showed an interest charge of $17.50. Young wrote to plaintiff inquiring about these items. An investigation by plaintiff disclosed the fraudulent acts described above, and Harvey and Young were so advised. On or about November 20, 1947, plaintiff demanded that Linwood Bank pay it the amount of the checks, which demand was refused. This suit was filed on February 21, 1948.
After disclosure of the fraud but before this suit was instituted, Land notified Young that plaintiff had taken "all necessary precautions" to protect him against loss and that "the item of $1750.00 and the interest charge of $17.50" would be "eliminated" from his "statement." Thereafter the note for $1750, payable to Linwood Bank and bearing the forged signature of Young, was paid in full by plaintiff and the bank returned to plaintiff the securities listed on that note. This was accomplished by a series of transactions which need not be described in detail. We say the note for $1750 was "paid by plaintiff," for that was the result of such transactions. It was admitted at the trial that plaintiff "was out the $1750.00." Plaintiff retained Young's securities for safekeeping. Land testified that plaintiff would deliver these securities to Young on demand. It appears, therefore, that Young suffered no loss on account of Ryan's fraudulent acts.
After the discovery of Ryan's misconduct, plaintiff assured Harvey that his securities would be delivered to him on demand. At the time of the trial the note for $3200.00, payable to Linwood Bank and bearing the forged signature of Harvey, had not been paid and Harvey's securities were still in the possession of Linwood Bank. Land testified, however, that plaintiff was "paying the interest on the note," and that plaintiff would deliver the securities to Harvey on demand.
Ryan was not prosecuted and he did not testify at the trial.
Linwood Bank and the third party defendant, South Side Bank, denied liability and defended mainly on two grounds. The banks asserted, first, that the two *87 checks described in plaintiff's petition were, under the facts, payable to bearer by force of Sec. 3025(3), R.S.1939, as amended, Laws of 1945, p. 594, Mo.R.S.A. § 3025(3), R.S.1949, § 401.009(3). This defense was sustained by the trial court. If the checks were "bearer" instruments within the meaning of the statute, and therefore transferable by delivery, then it becomes immaterial whether the endorsements were forged or genuine, and plaintiff cannot recover. In such case the endorsements of the names of the designated payees, by whomever made, may be treated as superfluous and disregarded. Sec. 3046, R.S.1939, Mo.R.S.A. § 3046, R.S.1949, § 401.030; First National Bank of Kansas City v. Produce Exchange Bank of Kansas City, 338 Mo. 91, 96, 89 S.W.2d 33, 36; Globe Indemnity Co. v. First Nat. Bank in St. Louis, Mo.App., 133 S.W.2d 1066, 1069.
Prior to the amendment of 1945, the negotiable instrument law provided, Sec. 3025, R.S.1939: "The instrument is payable to bearer: * * * (3) when it is payable to the order of a fictitious or non-existing person and such fact was known to the person making it so payable". This provision is identical with Sec. 9(3) of the Uniform Negotiable Instruments Act. See 5 Uniform Laws Annotated, Part 1, p. 128. As stated in 118 A.L.R. 15, 17, "that provision has been a prolific source of litigation on the questions as to when the paper is `payable to a fictitious or nonexisting person' and when `such fact is known to the person making it so payable.'" See also annotations in 146 A.L.R. 840; 74 A.L.R. 822.
In the case of American Sash & Door Co. v. Commerce Trust Co., 332 Mo. 98, 56 S.W.2d 1034, decided prior to the amendment of 1945, it appeared that plaintiff's payroll clerk prepared the weekly payrolls and turned them over to a bookkeeper who made out the pay checks and delivered them to Mr. Simms, plaintiff's secretary and treasurer. Simms signed the checks for the plaintiff's corporation, relying on the information presented to him. The checks were then returned to the pay clerk whose duty it was to deliver the checks to the various department heads. The clerk fraudulently placed on the payrolls the name of a non-existent person, and the names of six real persons to whom the plaintiff was not indebted. Pursuant to the regular routine, checks payable to such persons were signed by Simms and returned to the clerk, who endorsed the names of the fictitious payees thereon and then cashed them. All of these checks were ultimately paid by the drawee bank and charged to the plaintiff's account. Simms was authorized to execute checks, but he had no knowledge of the clerk's fraudulent scheme. The plaintiff sued the drawee bank to recover its loss on the checks. After stating that the "law * * * is well established that the payee named in an instrument will be deemed fictitious though designating an existing person, if there was no intent he should have a beneficial interest in the paper", the Supreme Court, in applying the statute to the facts before it said, 56 S.W.2d loc. cit. 1040: "under our statute two questions arise: (1) Who was the "person' in this case that made the * * * checks payable to the payees therein designated, and whose intention must be consulted in determining whether the payees were fictitious * * *. And (2) did the `person' making the checks so payable know the payees were fictitious * * *." In answering these questions the court held (1) that the phrase "person making it so payable", as used in the statute, referred to the legal maker of the check, in this case the plaintiff corporation, and (2) that the corporation was not chargeable with the guilty knowledge of the payroll clerk because it was not within the actual, implied or apparent scope of his employment to execute checks. The court pointed out, however, that "when the agent or employee who drew the check had authority from the maker to execute checks, it is held in several cases the maker will be bound by his knowledge and intention (though secret and fraudulent) and the check will be payable to bearer if made out to a person not intended by him to receive it." 56 S.W.2d loc. cit. 1041. The court concluded that the checks were not *88 payable to bearer within the meaning of the statute and, therefore, that the defendant bank was liable to plaintiff for the amount of the checks. See also First National Bank of Kansas City v. Produce Exchange Bank of Kansas City, supra; Globe Indemnity Co. v. First Nat. Bank in St. Louis, supra. The significance of the Sash & Door Company case becomes apparent when we consider the amendment of 1945. As indicated above, the transactions here involved took place subsequent to such amendment.
The statute, as amended, Laws 1945, p. 594, Mo.R.S.A. § 3025(3), R.S.1949, § 401.009(3), reads as follows: "The instrument is payable to bearer * * * (3) When it is payable to the order of a fictitious or nonexisting person or to a living person not intended or entitled to have any interest in it and such fact was known to the person making it so payable or was known to his employee or other agent who supplies or causes to be inserted the name of such payee * * *." (We have italicized the words added by the amendment.)
The amendment has not been construed heretofore by any appellate court in this state. However, ten other states have adopted similar amendments and there are several reported cases involving the construction of such amendments. Thus, the Illinois negotiable instrument act was amended in 1931 so as to make an instrument payable to bearer "When it is payable to the order of a fictitious or non-existent or living person not intended to have any interest in it, and such fact was known to the person making it so payable, or known to his employee or other agent who supplies the name of such payee". 111.Rev. Stat. 1949, Ch. 98, par. 29, subd. 3, sec. 9(3). The italicized words were added by the amendment of 1931. In Houghton Mifflin Co. v. Continental 111. National Bank and Trust Co., 293 Ill.App. 423, 12 N.E.2d 714, the plaintiff's bookkeeper, whose duty it was to make out checks in payment of salaries but not to sign them, prepared twenty checks payable to certain salesmen in the employ of plaintiff and presented them to plaintiff's agents who were authorized to execute checks, and after the checks were signed, instead of delivering them to the respective payees, she first endorsed on each of the checks the name of the payee, then her own, and then cashed the checks at different banks and appropriated the proceeds to her own use. When the checks were drawn plaintiff was not indebted to any of the named payees. In reversing a judgment in favor of plaintiff against the drawee bank which honored the checks and charged them to plaintiff's account, the Illinois court held that the checks were bearer instruments within the meaning of the last quoted statute, as the checks were all made payable to living persons and such persons were not intended by the bookkeeper to have any interest in them. Under the statute the plaintiff was bound by the guilty knowledge and intent of its bookkeeper who "supplied" the names of the payees, although she had no authority to execute checks. The court pointed out, however, that if the case had been governed by the statute as it previously existed the bank would have been liable, for the knowledge of the bookkeeper would not have been imputed to the plaintiff. Citing United States Cold Storage Co. v. Central Mfg. Dist. Bank, 343 111. 503, 175 N.E. 825, 74 A.L.R. 811, which is in accord with the Missouri decision in the Sash & Door Company case, supra.
The Houghton Mifflin case was followed in Hillman v. Kropp Forge Company, 340 Ill.App. 606, 92 N.E.2d 537. See also Swift & Co., Inc. v. Bankers Trust Co., 280 N.Y. 135, 19 N.E.2d 992, and Swift & Co. Inc. v. Chemical Bank & Trust Company, 164 Misc. 320, 299 N.Y.S. 105, where the New York courts applied the Illinois statute as amended. The Georgia statute is identical with the Illinois statute. In Citizens Loan & Security Co. v. Trust Co. of Georgia, 79 Ga.App. 184, 53 S.E.2d 179 (under facts similar to those in the Sash & Door Company case, supra), it was held that the checks were payable to bearer. The court said that "the object of the statute is to protect drawee banks from losses which otherwise would be sustained as the result of fraud exercised by an agent of a bank depositor in cases similar to the one at bar." 53 S.E.2d loc. cit. 181.
*89 In the case at bar, Ryan represented to Land, plaintiff's secretary-treasurer, that Harvey and Young wished to borrow money on their securities, which representations were wholly false. In each instance Ryan delivered to Land a promissory note made payable to Linwood Bank and bearing the forged signature of the supposed borrower. Throughout the transactions, plaintiff's officers relied upon Ryan's representations and made no effort to determine whether they were true. In each instance plaintiff's officers placed their signatures upon the check in the belief that the supposed loan was warranted and proper, and in the belief that the check would be delivered to the designated payee and that he would receive the proceeds thereof. The trial court found, however, that when Ryan made the false representations to Land "the said Ryan did not intend that the said Harvey or the said Young should receive said checks or any beneficial interest therein * * *," and "that when said checks were delivered to Ryan for delivery to the payees named therein, he, in fact, had no intention of delivering the said checks to the named payees but instead intended to convert said checks and their proceeds to his own use and benefit." These findings are supported by the uncontradicted evidence. In view of these facts, it is clear that each check was payable to the order of "a living person not intended * * * to have any interest in it." The conduct of the employee Ryan, as disclosed by the evidence, amounted to supplying the names of the payees within the meaning of the 1945 amendment. The plaintiff corporation was the "person" who in the statutory sense made the checks payable to the named payees; but it is bound by the guilty knowledge and intent of Ryan. This is so notwithstanding the fact that Ryan had no authority to prepare, execute or issue the checks in question. Cf. American Sash & Door Co. v. Commerce Trust Co., supra.
Plaintiff contends, however, that the checks were not bearer instruments because the named payees were "entitled" to certain interests in the checks. As we have seen, the statute reads in part: "The instrument is payable to bearer * * * (3) When it is payable to the order of * * * a living person not intended or entitled to have any interest in it * *." Plaintiff's argument runs as follows: The word "or" was used by the legislature in the sense of "nor" because it is preceded by the negative "not," which corresponds to "neither," as "neither this nor that," citing State v. Bradley, 352 Mo. 780, 179 S.W.2d 98. Hence an instrument payable to the order of a living person is a bearer instrument, within the meaning of subdivision (3) of the statute, "only if the payee is neither intended nor entitled to have any interest in it." Plaintiff then asserts that the named payees (Harvey and Young) "were entitled to interests in the checks"; therefore, the checks were not bearer instruments. If plaintiff's argument is sound, then the drawee bank is liable for the amount of the checks even though plaintiff was chargeable with the guilty knowledge and intent of Ryan. The banks contend that the word "or" was used in the disjunctive sense; consequently the checks were bearer instruments regardless of whether the named payees were "entitled to have any interest" therein; and in the alternative, that Harvey and Young were not entitled to any interest in the checks. It should be stated here that the words "or entitled" do not appear in the corresponding statutes of other states.
We need not determine whether the word "or" was used by the legislature in the disjunctive sense or in the sense of "nor." Conceding, arguendo, that plaintiff's construction of the statute is the correct one, it cannot recover if Harvey and Young were "neither intended nor entitled to have any interest" in the checks. As stated, the named payees were "not intended * * * to have any interest" in the checks because Ryan's fraudulent intent was imputable to plaintiff by reason of the 1945 amendment. Plaintiff insists, however, that the payees were entitled to certain "rights" or "interests" in the instruments, including the following: "(1) If before the checks got out of the hands *90 of plaintiff, the payees had demanded the checks, they would have been entitled to them. (2) They were entitled to ratify the pledges if they so desired. (3) They were entitled to follow the proceeds of the checks, at least until the rights of bona fide holders should intervene. (4) While the proceeds of these checks were deposited in the account of the forger Ryan, the payees would have been entitled to follow the proceeds and enforce a lien against same. (5) They were entitled to maintain actions against South Side Bank on the checks." As we understand plaintiff's argument, all of these propositions are based on the premise that "the pledge of the payees' securities produced these checks." The cases and texts cited by plaintiff do not support its position.
In support of the contention that Harvey and Young "were entitled to ratify the pledges if they so desired," counsel for plaintiff cite 41 Am.Jur., Pledge and Collateral Security, p. 590, where it is said: "Since an unauthorized pledge is injurious to the real owner alone, he may ratify or confirm it at his pleasure." They also assert that Harvey and Young were entitled to adopt and ratify the forged notes. Whether a forgery may be ratified is a question upon which there is some conflict of authority. See Johnson v. Crown Finance Corp., Mo.App., 222 S.W.2d 525; Kelchner v. Morris, 75 Mo.App. 588. However, it is unnecessary to discuss these points, for "The validity of the check, the scope of the order to pay and the person authorized by the drawer to receive payment are fixed at the inception of the instrument * * *." Swift & Co. Inc. v. Bankers Trust Co., 280 N.Y. 135, 19 N.E.2d 992, 997. Furthermore, Harvey and Young did not ratify the unauthorized pledges or the forged notes.
In support of its contention that the named payees "were entitled to maintain actions against South Side Bank," plaintiff relies upon the case of Universal Carloading & Distributing Co. v. South Side Bank, 224 Mo.App. 876, 27 S.W.2d 768, 770, where the plaintiff's clerk, without authority, endorsed plaintiff's name on checks payable to plaintiff and presented the same to defendant bank, which credited the clerk's personal account with the amount of the checks and then collected such amount from the drawee bank. It was held the defendant bank was liable to plaintiff for the amount of the checks. This case is clearly distinguishable, for the court said that it "was tried upon the theory that plaintiff was the owner of the checks in question and was entitled to their possession and to the proceeds" thereof. Reliance upon this case is based on the assumption that Harvey and Young were entitled to the proceeds of the checks here involved, whereas the very question at issue is whether they were so entitled.
In connection with the contention that Harvey and Young "were entitled to follow the proceeds of the checks," plaintiff cites Universal Carloading & Distributing Co. v. South Side Bank, supra, and refers to that part of the opinion where the court quoted from Perry on Trusts (5th Ed.), sec. 221, as follows: "`So property obtained by one through the fraudulent practices of a third person will be held under a constructive trust for the person defrauded, though the person receiving the benefit is innocent of collusion. If such person accepts the property, he adopts the means by which it was procured.'" 27 S.W.2d loc. cit. 772. We have no quarrel with this general rule, but plaintiff's attempt to apply it in this case is based on the assumption previously mentioned. Counsel again beg the question by assuming that Harvey and Young were entitled to the proceeds of the checks.
As indicated above, plaintiff relies upon its own wrongful act of delivering the stock certificates to Linwood Bank to support its claim that Harvey and Young were entitled to interests in the checks and, therefore, that Linwood Bank is liable to it for the amount of such checks. We are not impressed with plaintiff's argument. It is true, of course, that plaintiff was under a duty to deliver the stock certificates to the owners on demand. Although a certificate of stock is merely evidence of the stock itself, the certificate *91 is subject to conversion. See cases cited in Pierpoint v. Hoyt, 260 N.Y. 26, 182 N.E. 235, 83 A.L.R. p. 1199. But it is one thing to say that Harvey and Young were entitled to hold plaintiff responsible for the unauthorized pledging of their stocks and to recover from plaintiff the value thereof in the event it failed or refused to deliver the certificates on demand. It is another to hold that they were entitled to interests in the checks at the time the instruments were issued. As stated, the undisputed evidence shows that neither Harvey nor Young wanted to borrow money as represented by Ryan; that the signatures on the notes were forged; and that the checks in question were never delivered to the named payees. In fact, neither Harvey nor Young had any knowledge of the fraudulent transactions giving rise to this cause until after the checks had been charged to plaintiff's account in Linwood Bank. Obviously, the notes bearing the forged signatures of Harvey and Young were wholly inoperative and imposed no liability upon the purported makers. Johnson v. Crown Finance Corp., supra. Under these facts, we think it is clear that the named payees were not entitled to have any interest in the checks. Since the payees were neither intended nor entitled to have any interest in the checks, it follows that the instruments were payable to bearer even if plaintiff's construction of the statute is the correct one. For this reason the judgment should be affirmed.
As a second defense the banks alleged that plaintiff was estopped to deny the validity of the purported endorsements of the named payees. This defense was also sustained by the trial court. In view of the conclusion which we have reached, it is unnecessary to consider the second defense.
SPERRY, C., concurs.
PER CURIAM.
The foregoing opinion of BOUR, C., is adopted as the opinion of the court. The judgment is affirmed. All concur.